## 44322, 44339. WILSON v. THE STATE (two cases).
(359 SE2d 891)

Weltner, Justice.

Arthur Wilson shot and killed his brother Anthony with a handgun. Elizabeth Wilson, the mother of Arthur and Anthony, was found guilty of the murder of her son, and Arthur Wilson was found guilty but mentally ill of the murder of his brother.[1]

On the day of the killing Anthony Wilson drove his truck to a garage, intending to leave it for repair. He telephoned his parents' home and asked that someone come to the garage and take him home. Elizabeth Wilson conveyed this message to her husband, Glenn Wilson, who then prepared to drive to the garage. He was stopped by Elizabeth Wilson and Arthur Wilson, the latter saying "they were going to get Tony and if [Glenn] went over there, [he] would get killed, somebody would kill [him]."

Both Arthur Wilson and his mother were armed with handguns. Arthur Wilson drove to a point about two tenths of a mile from the garage, left his mother in the automobile, and walked to the garage where his brother waited. The garage owner and two of his employees were in the garage when Arthur Wilson entered and spoke to his brother, telling him he had come to give him a ride. The brothers remained in the garage for five to ten minutes and then left. Anthony Wilson exited first. Arthur Wilson followed, closing the door behind him. Almost immediately he re-entered the garage to inquire as to the whereabouts of one of the garage employees. He was told that the employee was in the men's room. Shortly thereafter Arthur Wilson was seen with a pistol in his hand and was heard to say, "You set me up." Anthony Wilson answered, "I promise you I didn't." Arthur Wilson then fired two shots at his brother, and Anthony Wilson cried

---

[1] The crime was committed on April 1, 1985, and the indictments were returned on September 25, 1985. Elizabeth Wilson and Arthur Wilson were convicted and sentenced on June 21, 1986. Motions for new trials were filed on June 23, 1986, and were denied on December 15, 1986. Notices of appeal were filed on January 12 and January 14, 1987. The record on appeal was docketed in this court on February 6, 1987, and these cases were argued before this court on April 7, 1987.

out, "I'm down and I can't get up. For God's sake, don't shoot me any more, Art." Arthur Wilson fired two more shots.

The garage owner and his employees hastily left the garage, and as they did, Elizabeth Wilson was seen in the driver's seat of an automobile in the driveway of the garage, headed out of the driveway in the direction of a public road. Arthur Wilson went to his mother, handed her his pistol and said, "Take that damn thing and throw it as far as you can. I don't want to see it again." Elizabeth Wilson immediately left the garage, drove to Lake Hartwell, and threw the weapon into the lake. She later assisted members of the sheriff's office in recovering the weapon.

Arthur Wilson placed his dead brother's body in the pickup truck and drove to a tire store a few miles away. He parked near the tire store, went into the store, and asked the proprietor to come with him to the truck. When the two arrived at the truck Arthur Wilson asked, "What do you think we ought to do?" The tire store proprietor inquired as to the identity of the person in the truck and asked what had happened. Arthur Wilson replied, "The boy had called for some help and I helped him out." Arthur Wilson remained at the tire store until a member of the sheriff's department arrived and arrested him without incident.

After the killing, Elizabeth Wilson saw the owner of the garage at the sheriff's office, and she said to him, "[I am] sorry that it happened at [your] shop, but it had to be done."

A little less than two years before Arthur Wilson killed his brother, Anthony Wilson beat his mother so severely that she was hospitalized for three days. Elizabeth Wilson testified that the beating was without provocation. Loretta Wilson, Anthony's widow, who was present when the confrontation began, testified that Elizabeth Wilson came toward her son with scissors in her hand and he acted in self-defense.

Loretta Wilson also testified that prior to the killing her mother-in-law said to her, "[T]hat if anybody got killed or anything, that they'd throw the gun in Lake Hartwell and [they] wouldn't find it, and therefore, if they didn't have the gun, they couldn't press charges, couldn't prove it." Loretta Wilson visited Arthur Wilson in jail and asked him why he shot her husband. He answered, "Tony had a gun . . . it was self defense . . . and . . . well this [is] what [I am] going to stick to."

At trial two psychiatrists and one psychologist testified that at the time of the killing Arthur Wilson was insane, having been unable to distinguish right from wrong and having acted under a delusional compulsion. Arthur Wilson was diagnosed by these three experts as being a paranoid schizophrenic.

1. Both Elizabeth Wilson and Arthur Wilson contend it was error

for the trial court to deny their motions for directed verdicts of acquittal. The evidence in these cases is such that a rational trier of fact could have found Elizabeth Wilson guilty beyond a reasonable doubt of malice murder, hindering the apprehension or punishment of a criminal, and concealing the death of another; and Arthur Wilson guilty beyond a reasonable doubt of malice murder but mentally ill. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Mary Lynn Wilson testified on behalf of her husband, Arthur, and at the conclusion of her re-direct examination the trial court asked her if she knew of any reason why her father-in-law waited three or four days before he visited her husband who was then in custody. She stated she did not know. At this point, out of the presence of the jury, a motion for mistrial was made on behalf of Arthur Wilson on the ground "the questions propounded to this witness by the Court might show the position of the Court or might give undue influence and weight to the comments of the Court." The motion was overruled. " 'The trial judge has the right to propound a question or a series of questions to any witness for the purpose of developing fully the truth of the case; and the extent to which the examination conducted by the court shall go is a matter within his discretion.' " *Thomas v. State*, 240 Ga. 393, 400 (242 SE2d 1) (1977); *Williams v. State*, 250 Ga. 664, 666 (300 SE2d 685) (1983). The questioning of this witness by the trial court was not an abuse of discretion, and not error.

3. Glenn Vernon Wilson, Jr., the oldest of the three Wilson sons testified on behalf of his brother, Arthur. At the conclusion of his testimony the trial court instructed the jury to disregard totally his testimony because of breaches by this witness of the court's invocation of the rule of sequestration, including remaining in the courtroom during testimony and conversing with a defendant, his mother, and a witness, his sister-in-law. Neither Elizabeth Wilson nor Arthur Wilson objected to the ruling or moved for a mistrial at the time. The following day the court elaborated on its reasons for instructing the jury to disregard the testimony of Glenn Vernon Wilson, Jr., and at this time on behalf of Arthur Wilson the following statement was made: "Yes sir, of course, Your Honor at the close of the evidence for the purpose of perfecting the record, I would make an exception on the record." Still later, on behalf of Arthur Wilson the court's attention was called to *Jordan v. State*, 247 Ga. 328, 346 (276 SE2d 224) (1981), in which it was held that it was error, although harmless error in that instance, to refuse to permit a witness to testify who had violated the rule of sequestration. In this case,the court should not have instructed the jury to disregard the testimony of Glenn Vernon Wilson, Jr. However, in order to preserve for review such a ruling by the trial court, proper and timely objection is required. As none was made, that ruling will

not be reviewed. *Davis v. State*, 230 Ga. 902 (199 SE2d 779) (1973).

4. Elizabeth Wilson contends it was error for the trial court to charge the jury on flight. There was ample evidence to support the charge on flight. Elizabeth Wilson did not remain at the scene of the killing, and this is circumstantial evidence of her guilt. The charge given on flight was not error. *Waters v. State*, 248 Ga. 355, 366 (283 SE2d 238) (1981). But see Justice Bell's concurring opinion in *Cameron v. State*, 256 Ga. 225 (345 SE2d 575) (1986).

5. Elizabeth Wilson, armed with a handgun, went to the scene of the killing with her son Arthur, and immediately after the killing, at her son's request, disposed of the murder weapon by throwing it in a lake. The trial court charged on the necessity for corroboration of the testimony of an accomplice. We note that Arthur Wilson, who was his mother's accomplice, did not testify. The charge stated correctly the principle of law, and was for the benefit of Arthur Wilson. It was, of course, inapplicable to Elizabeth Wilson, as no accomplice of hers testified. As such, she has no basis for complaint.

6. Arthur Wilson complains that a lay witness, his father, was prevented from giving his opinion that Arthur Wilson was insane when he killed his brother. An objection was made by the district attorney to the question: "Do you have an opinion of your son's mental condition on that date?" The objection was sustained. Later, however, the father was permitted to testify without objection that he doubted very seriously that Arthur Wilson knew what he was doing and that he doubted that his son knew the difference between right and wrong when he killed his brother. There was no error.

7. Arthur Wilson contends that it was error to permit Pat Crane, wife of the Sheriff of Banks County, to testify as a rebuttal witness. Arthur was jailed for about three months in the Banks County jail, and during this time Pat Crane was responsible for the feeding of the prisoners. She testified that she saw Arthur Wilson about one hundred times, that he slept a lot, that he caused no problems or disturbances, that at times he was depressed, that he was friendly toward her, and that the two of them would talk from time to time. The objections to this testimony were that Mrs. Crane's name was not on the witness list, and this witness was incompetent to "testify as to any sanity on the part of [Arthur Wilson] because of her limited observations of [him]." It is not error to call an unlisted witness in rebuttal. *Mize v. State*, 240 Ga. 197 (1) (240 SE2d 11) (1977). The other ground of the objection is without merit.

8. Arthur Wilson objected at the trial to the introduction into evidence of photographs of his brother's body taken before an autopsy was performed. The photographs showed wounds inflicted by Arthur Wilson's handgun. "A photograph which shows mutilation of a victim resulting from the crime against him may, however gruesome,

have relevance to the trial of his alleged assailant." *Brown v. State,* 250 Ga. 862, 867 (302 SE2d 347) (1983).

9. Arthur Wilson tendered into evidence photographs taken of him, some with members of his family, from one to eight years before the killing. These photographs were supposed to demonstrate to the jury the change in his appearance caused by his mental illness. His wife testified that while the photographs did not show any change in physical appearance, they did show the "sparkle" in his eyes which was now gone. Three of the photographs were admitted, and the rest were not. The trial court's decision on the exclusion of the photographs will not be disturbed unless an abuse of discretion is shown, and none here is shown. *Brooks v. State,* 244 Ga. 574, 582 (261 SE2d 379) (1979).

10. Arthur Wilson, after being advised of his rights and after executing a waiver of these rights, gave three statements to law enforcement officers. It is conceded that these officers did not use coercion or engage in other offensive practices in order to obtain the statements. A Jackson-Denno hearing was conducted by the trial court, and the trial court ruled the three statements could be admitted. Arthur Wilson argues that even though the statements were not obtained by police coercion, they should not have been admitted because at the time they were given his free choice was significantly impaired by his alleged insanity, and, therefore, the statements were not given voluntarily. He also contends that his waiver of his right to counsel at the time of questioning was ineffective because of his alleged insanity.

The U. S. Supreme Court recently addressed these issues in *Colorado v. Connelly,* ___ U. S. ___ (107 SC 515, 93 LE2d 473) (1986), as follows: "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause." 107 SC at 522. The Court then addressed the waiver of *Miranda* rights: "Respondent urges this Court to adopt his 'free will' rationale, and to find an attempted waiver invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police. . . . *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the 'voice of God,' however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." Id. at 524. "[A] defendant's mental condition, by itself and apart from its relation to official coercion, should [never] dispose of the inquiry into constitutional 'voluntariness.'" Id. at 520.

Arthur Wilson has never contended that any of his statements or waivers were obtained through police misconduct of any kind. Hence, there was no error.

11. The jury found that Arthur Wilson failed to prove by a preponderance of the evidence that he was insane at the time of the killing. He contends that under the evidence the only finding the jury could have made was that he was insane. This enumeration is controlled by the following precepts:

(a) OCGA § 16-2-3 provides: "Every person is presumed to be of sound mind and discretion but the presumption may be rebutted."

(b) "[T]he presumption of sanity does not disappear upon the introduction of evidence to the contrary and may be relied upon by the jury even after the introduction of evidence of insanity." *Brown v. State*, 250 Ga. 66, 71 (295 SE2d 727) (1982). "The presentation of evidence to the contrary does not automatically dissipate the presumption of sanity which exists by law." *Moses v. State*, 245 Ga. 180 (263 SE2d 916) (1980).

(c) Insanity is an affirmative defense and the burden of proof on one asserting such a defense is proof by a preponderance of the evidence. *Durham v. State*, 239 Ga. 697 (238 SE2d 334) (1977). "[The] appropriate standard of appellate review of the sufficiency of the evidence with regard to a jury's finding of sanity in a criminal case is whether after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime." *Brown v. State*, 250 Ga. at 71-72.

(d) "Jurors are not bound by the opinions of either lay witnesses or expert witnesses as to the question of sanity and they may rely on the basic presumption existing under our law. . . .The jury is free to reject expert testimony as to sanity and may find an accused sane even without positive testimony as to sanity." *Moses v. State*, supra at 181.

(e) When proof of insanity is overwhelming, juries may not rely solely on the rebuttable presumption of sanity. It is a jury's function to determine the credibility of witnesses and the probative value of testimony. Juries must weigh the evidence and may not arbitrarily ignore it. Proof of insanity may be so clear and so overwhelming that a finding of sanity cannot be upheld. *Brown v. State*, 250 Ga. at 71 and *Stevens v. State*, 256 Ga. 440, 442 (350 SE2d 21) (1986).

(f) "Schizophrenia is a psychosis, but a psychosis is not the equivalent of insanity — although they may be difficult to distinguish. . . . It is a mental illness and is a 'general term for any major mental disorder of organic and/or emotional origin characterized by derangement of the personality and loss of contact with reality, often with delusions, hallucinations, or illusions.' " *Dennis v. State*, 170 Ga.

App. 630 (317 SE2d 874) (1984).

(g) " 'Mentally ill' means having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. . . . However, the term 'mental illness' shall not include a mental state manifested only by repeated unlawful or antisocial conduct." OCGA § 17-7-131.

With these statutes and appellate opinions in mind, we have reviewed the rather voluminous record in Arthur Wilson's case and conclude that while evidence as to insanity was strong, particularly the expert testimony, it was not overwhelming. Based on the evidence in this case a rational trier of fact could have found that Arthur Wilson failed to prove insanity by a preponderance of the evidence. *Brown v. State,* 250 Ga. 66, supra.

12. Arthur Wilson attacks the constitutionality of OCGA § 17-7-131, which authorizes a verdict of guilty but mentally ill, contending, among other things, that "the application of this law has been unreasonable, arbitrary, and capricious because of the lack of definition and direction." This contention was dealt with in *Worthy v. State,* 253 Ga. 661, 666 (324 SE2d 431) (1985). The other contentions of unconstitutionality likewise are rejected. *Keener v. State,* 254 Ga. 699, 702 (334 SE2d 175) (1985).

*Judgments affirmed. All the Justices concur.*

DECIDED SEPTEMBER 9, 1987 —
RECONSIDERATION DENIED SEPTEMBER 30, 1987.

*Floyd W. Keeble, Jr., Daniel J. Parker,* for appellant (case no. 44322).

*Andrew J. Hill, Jr.,* for appellant (case no. 44339).

*Lindsay A. Tise, Jr., District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn, Assistant Attorney General,* for appellee.