## S94A0203. NAGEL v. THE STATE.
(442 SE2d 446)

CARLEY, Justice.

Appellant was tried before a jury for the murder of his grandparents, but he was acquitted by reason of his insanity. The trial court, finding that appellant met the criteria for civil commitment set forth in OCGA § 37-3-1 (9.1), placed him in the custody of the Department of Human Resources.

Pursuant to OCGA § 17-7-131 (f), appellant subsequently filed an application for his release from civil commitment. After a hearing, the trial court denied the application, relying entirely upon the presumption of appellant's continuing insanity. OCGA § 24-4-21. On appeal, however, this court remanded for the trial court to make specific findings of fact and conclusions of law, holding, in material part, as follows:

> [T]he factfinder, here the trial court, may not disregard expert medical evidence and rely solely on the presumption of [continuing] insanity. Nevertheless, . . . it was necessary not only that [appellant] present the testimony of experts and other evidence supporting his position, but also that the testimony be of sufficient weight to overcome the presumption. [The] "appropriate standard of appellate review . . . is whether after reviewing the evidence in the light most favorable to the [S]tate, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was [sane]. . . . [Cit.]" [Cit.] . . . Upon appeal, if any, we will apply the aforestated standard of review.

*Nagel v. State*, 262 Ga. 888, 891-893 (2) (a), (b) (427 SE2d 490) (1993).

On remand, the trial court made the requisite findings of fact and conclusions of law and again denied appellant's application for release. Appellant appeals to this court from the order entered by the trial court on remand.

1. The instant appeal is not a criminal case wherein appellant stands accused or convicted of murder. It is an appeal from the denial of an application for appellant's release from the civil commitment which followed his acquittal on two counts of murder by reason of his successful insanity defense. The Court of Appeals, rather than this court, would have initial appellate jurisdiction over this type of civil case. However, this court did entertain appellant's original direct appeal and, pursuant to that prior appeal, the case was remanded to the trial court. Accordingly, "we [will] retain jurisdiction based upon the

procedural posture of [this case]." *City of Winder v. Collins*, 259 Ga. 570 (385 SE2d 71) (1989). See also *Air Line Employees Assn. Intl. v. Evans*, 236 Ga. 661 (225 SE2d 34) (1976).

2. Appellant urges that he has carried the burden of proving his sanity by a preponderance of the evidence and that the trial court erred in holding otherwise.

"The [trial] court must consider expert and other evidence presented at the release hearing, and contained in the trial record, on the issue of sanity or insanity." *Nagel v. State*, supra at 892 (2) (b). In the instant case, that evidence authorized the trial court to find that the murders of appellant's grandparents were not the only violent acts which he had ever committed. Those murders were merely the most violent acts which appellant had ever committed. Moreover, the trial court was also authorized to find that appellant's current civil commitment is not the only instance of his hospitalization for mental illness. Previously, appellant "has been treated in at least two private psychiatric facilities and has been hospitalized in public mental health facilities on numerous occasions." Indeed, appellant had murdered his grandparents "less than three weeks following his last release from a mental hospital. . . ." Thus, the evidence supported the trial court's finding that appellant has exhibited "a steady pattern of violent behavior" which culminated in his murder, while insane, of "the only people who were willing to love him and give him a home."

In attempting to prove his sanity, appellant proffered the testimony of two experts. However, neither of appellant's experts held the opinion that he had *recovered* from being mentally ill. Rather, both were of the opinion that appellant had *never been* mentally ill. In fact, one of the experts characterized the acquittal of appellant by reason of his insanity as having been a "mistake" on the part of the jury.

The opinions of appellant's experts that he had never really been insane were obviously entitled to *no* weight whatsoever, since the jury's verdict was res judicata as to appellant's insanity at the time of the murders.

> "A verdict of not guilty by reason of insanity *establishes* two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of *mental illness*. [Cit.]" . . . [U]nder Georgia law the presumption of *continuing insanity* has some evidentiary weight. Of course, a presumption is meaningless if it does not possess some weight of its own. It must be of sufficient substance such that, standing alone, *it cannot be lightly overcome*.

(Emphasis supplied.) *Nagel v. State*, supra at 889-890 (1). Thus, the

issue to be determined was whether appellant's sanity had been *restored* since the jury had returned its verdict, *not* whether the jury had made a "mistake" in originally accepting the insanity defense that appellant himself had advanced.

Nevertheless, appellant's experts merely expressed the opinion that all of his prior acts of violence, including the murders of his grandparents, were the result of his voluntary drug and alcohol abuse rather than his mental illness. However, one of the experts did acknowledge the "possibility" that appellant's substance abuse could have rendered him "temporarily psychotic." This expert also testified that substance abuse can have the effect of inducing psychotic "hallucinations." In addition, this expert admitted that he had really "never been sure" whether appellant's substance abuse had or had not rendered him "psychotic." Therefore, this expert certainly could not eliminate the "possibility" that appellant's substance abuse did, in fact, have the effect of rendering him violently "psychotic."

Both of appellant's experts agreed that, if appellant were to be released from civil commitment, it would be imperative that he abstain from drugs and alcohol use. However, neither of the experts had ever had occasion to observe appellant other than in a hospitalized setting wherein he was subjected to "forced abstinence." As one of the experts candidly testified, "when an individual is on forced abstinence, you don't know what's going to happen when [he] get[s] back face to face with it with money in [his] pockets and bottles on the shelves." Both experts agreed that there was no "guarantee" that, if appellant were released from the "forced abstinence" of hospitalization, he would not return to his pattern of substance abuse. As one of the experts acknowledged, "it's only a matter of days, sometimes weeks at most, until [some substance abusers are] right back in the same shape."

"The trial court, rather than mental health professionals, has the responsibility for deciding applications for release under OCGA § 17-7-131. [Cit.]" *Nagel v. State*, supra at 889 (1). In the instant case, the trial court was authorized to find that appellant's experts were, in effect, attempting to impeach the original verdict of the jury which had accepted appellant's insanity defense, rather than attempting to demonstrate that appellant's sanity had been restored subsequent to the jury's unimpeachable verdict. Moreover, based upon the testimony of appellant's experts themselves, the trial court was also authorized to find that appellant became violently "psychotic" when he engaged in substance abuse and that, although appellant might not exhibit violently "psychotic" behavior so long as he underwent the regimen of "forced abstinence" in a hospital setting, there was nothing to show that, once released from that setting and regimen, he would not again engage in substance abuse and commit yet another

violent "psychotic" act.

Thus, it cannot be said that proof of the restoration of appellant's sanity was " 'so clear and so overwhelming that a finding of (insanity) cannot be upheld.' [Cit.]" *Nagel v. State*, supra at 891 (2) (a). After reviewing the evidence in the light most favorable to the State, we hold that a rational trier of fact could have found that appellant failed to prove by a preponderance of evidence that he was no longer insane and should be released from civil commitment. See *Butler v. State*, 258 Ga. 344 (369 SE2d 252) (1988).

3. Appellant contends that an irrebuttable and, therefore, unconstitutional presumption of his continuing insanity has been applied so as to keep him in civil commitment. However, the trial court, following the direction given by this court in *Nagel v. State*, supra, has neither disregarded expert medical evidence nor relied solely on the presumption of appellant's continuing insanity. In the context of the instant appeal, this court has given the trial court's decision the "heightened scrutiny" required by *Nagel v. State*, supra. Accordingly, there is no merit to appellant's contention that his continued civil commitment is violative of his federal and state constitutional rights.

*Judgment affirmed. All the Justices concur, except Sears-Collins, J., who dissents.*

SEARS-COLLINS, Justice, dissenting.

In this case we are required to decide the fate of David Nagel, a young man who, over 13 years ago, was little more than a loaded gun with a hair trigger, waiting to fire. And fire he did. This court has seen few other cases that are as repulsive and brutal as this one.

Because of the circumstances of his crimes, Nagel's request for release has caused much anxiety and apprehension. Nevertheless, this court is required by law not to act on such passions, but rather to apply the laws of this state to this delicate situation.

Applying Georgia law to this case, I must disagree with the majority's affirmance of the trial court's decision not to release David Nagel.

1. As an insanity acquittee, OCGA § 17-7-131 (f) entitles Nagel to release if he showed by a preponderance of the evidence that he no longer meets the inpatient civil commitment requirements of Chapter 3 of Title 37. Those requirements are set forth in OCGA § 37-3-1 (9.1). These are the same standards by which this State judges the release of persons who are not insanity acquittees but who were initially committed as involuntary inpatients under the procedures of Chapter 3 of Title 37.

It is important to emphasize that the majority never examines the statutory requirements for involuntary inpatient commitment, § 37-3-1 (9.1), and completely ignores one of those requirements.

Under § 37-3-1 (9.1), for a person to be civilly committed as an inpatient, three requirements must be met. The person must be mentally ill, § 37-3-1 (9.1); the person must be dangerous to himself or others, as evidenced "by either recent overt acts or recent expressed threats of violence," § 37-3-1 (9.1) (A) (i), or unable to care for his "own physical health and safety as to create an imminently life-endangering crisis," § 37-3-1 (9.1) (A) (ii); and the person must be "in need of involuntary inpatient treatment," § 37-3-1 (9.1) (B). As all three of these requirements must co-exist to commit a person as an involuntary inpatient, it necessarily follows that if a person seeking release under § 17-7-131 (f) shows by a preponderance of the evidence that any one of these three requirements is not met, then the person has carried his or her burden of proof and must be discharged.

The majority, in spite of the clarity of this statutory scheme, only addresses Nagel's argument that he is not mentally ill. The majority entirely disregards Nagel's contention that he proved he is not dangerous to himself or others. The majority does so in the apparent belief that a lack of dangerousness is not an independent ground for release, regardless of the presence or absence of mental illness. As I have already noted, this analysis flies in the face of the statutory scheme.

In fact, not only is a lack of mental illness *or* a lack of dangerousness a ground for release under our statutes, the lack of either requires a release under constitutional law. The United States Supreme Court has held that " 'the Constitution permits the Government, on the basis of an insanity judgment, to confine [the insanity acquittee] until such time as he has regained his sanity *or* is no longer a danger to himself or society.' " (Emphasis supplied.) *Foucha v. Louisiana*, ____ U. S. ____ (112 SC 1780, 1784, 118 LE2d 437) (1992). "[T]he acquittee may be held as long as he is both mentally ill and dangerous, but no longer." Id.

At Nagel's release hearing, I believe he carried his burden to show by a preponderance of the evidence that he is no longer mentally ill, as defined by § 37-3-1 (11). Moreover, even if we defer to the trial court's evaluation of the mental illness issue, Nagel clearly carried his burden to show that he does not meet the dangerous standard set forth in § 37-3-1 (9.1) (A) (i) (the parties agree that he is able to care for himself, § 37-3-1 (9.1) (A) (ii)). Finally, I conclude that Nagel carried his burden to show that he is not "in need of involuntary inpatient treatment." OCGA § 37-3-1 (9.1) (B).

2. Examining the majority's analysis of David Nagel's mental illness, it is important to note as a preliminary matter that where the majority uses the terms "sanity" and "insanity" when referring to David Nagel's mental state at the time of the release hearing, I will assume that the majority is referring to mental illness as defined by

§ 37-3-1 (11), as that is the standard by which § 17-7-131 (f) requires Nagel's release to be judged. Section 37-3-1 (11) defines mental illness as "having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Accord § 17-7-131 (a) (2). For the legal definition of insanity see OCGA §§ 16-3-2; 16-3-3; and 17-7-131 (a) (1).

More significantly, the majority misunderstands the relevant inquiry, and therefore, misconstrues and misstates the thrust of the experts' testimony. The majority expressly states that the issue at the hearing was whether Nagel's sanity "had been *restored* since the jury returned its verdict," majority opinion at 152 (emphasis in original), and appears to require that Nagel's experts acknowledge his insanity in 1981 and then demonstrate, from that benchmark, how Nagel has regained his sanity, id. at 151, 152. The issue as I see it, however, under § 17-7-131 (f), is not whether Nagel was mentally ill in 1981 but whether Nagel *presently* meets the requirements for civil commitment. See *Foucha*, 112 SC at 1784 (on petition for release four years after crimes, hospital could not continue to confine insanity acquittee absent a determination of *"current* mental illness and dangerousness") (emphasis supplied). The verdict of not guilty by reason of insanity merely raises a presumption of mental illness and is one piece of evidence on which a trial court may rely in making the determination of present mental illness. Thus, contrary to the implications of the majority opinion, the experts were not required to state that Nagel "had *recovered* from being mentally ill," majority opinion at 151 (emphasis in original), or that his "sanity had been restored subsequent to the jury's unimpeachable verdict," id. at 152. To assist Nagel in carrying his burden to prove that he is not presently mentally ill, these experts had the right simply to offer evidence that Nagel does not presently meet the definition of mental illness as defined by § 37-3-1 (11). This is only logical. If reasoned psychiatric opinion differed from the jury verdict and lead to the conclusion that Nagel was not, in fact, suffering from a disorder of thought or mood within the meaning of § 37-3-1 (11) at the time of the killing of his grandparents, the majority's analysis would confine Nagel for life, no matter how overwhelming the evidence that he is not now mentally ill. The only way for Nagel to overcome this particular burden would be to convince a psychiatrist to testify falsely that he or she is of the opinion that Nagel was mentally ill at that time and that the jury reached the correct result. Such a catch-22 could not possibly have been the intent of our release statutes.

Moreover, the majority misconstrues the thrust of the experts' testimony. The majority states that "the trial court was authorized to find that [Nagel's] experts were, in effect, attempting to impeach the

original verdict of the jury." Id. at 152. The trial court never made such a finding, however, and my review of the record shows that such a finding would not have been authorized. The experts spent the majority of their testimony demonstrating, based on evaluations and observations since 1985, why they believe David Nagel does not presently have a mental illness as that term is defined by § 37-3-1 (11) and is not presently dangerous to himself or others. One of the experts did, in fact, offer his opinion that he did not think Nagel had ever met the criteria for the insanity defense and that the jury had made a mistake with its verdict; however, that opinion constituted only a minor part of the expert's overall testimony, and significantly, the expert added that it was not his job to say whether or not Nagel met that criteria in 1981, as a jury had said that he did. The other expert expended 34 pages of trial transcript on direct and cross-examination explaining why he thought Nagel was not now mentally ill or dangerous to himself or others. Only when asked by the trial judge if Nagel had "ever been mentally ill" did the expert state that he did not think so. Even then, however, the expert qualified his opinion by stating Nagel had never exhibited, *"as far as [the expert] knew,"* any disorder of thought or mood. Neither expert ever attempted to review what the jury knew and attack its verdict based on that information. In sum, the experts' testimony cannot be fairly characterized as an attempt to impeach the jury's original verdict.

The majority also errs by relying on the experts' testimony that Nagel's substance abuse may have rendered him temporarily "psychotic" in the past in order to support its holding that the trial court was authorized to rule that Nagel failed to carry his burden to show that he is not "insane." Although severe substance abuse can lead to a toxic brain disease that can perhaps lead to a person's being classified as having a "disorder of thought or mood," see Stromberg & Stone, A Model Law on Civil Commitment of the Mentally Ill, 20 Harvard Journal of Legislation 275, 312-315 (1983), there is no evidence of that in this case. In fact, the only evidence offered at the hearing was that Nagel is of average intelligence and currently has *no* *"disorder of thought or mood."*

Moreover, neither the fact that Nagel might have suffered a "temporary psychotic" state from the use of alcohol in his past, nor the fact that he might suffer one in the future if he abuses alcohol or drugs, can support a finding that Nagel is *presently* mentally ill.

Furthermore, such "temporary psychotic" states as are often induced by substance abuse are not expressly or implicitly covered by the definition of mental illness in § 37-3-1 (11). Nagel's experts gave testimony to that effect, and that testimony, which was not contradicted by the state, is substantiated by our laws. The General Assembly has even enacted a separate chapter of Title 37 to deal with

mental health problems associated with drug and alcohol abuse. See Chapter 7 of Title 37. While Chapter 3 of Title 37 deals with mental illness, Chapter 7 of Title 37 pertains to the commitment of individuals whose "social . . . function is substantially disrupted," § 37-7-1 (1), (8), due to the consumption of alcohol or drugs and who present a "substantial risk of imminent harm" to themselves or others, OCGA § 37-7-1 (14.1) (A) (i). By enacting a separate chapter of the mental health code relating to mental health problems stemming from substance abuse, the General Assembly intended for the definition of mental illness in Chapter 3 to apply to those individuals who suffer a "disorder of thought or mood" when not on drugs or alcohol and for Chapter 7 of the mental health code to apply to individuals who abuse alcohol or drugs and who apart from that alcohol or drug abuse do not suffer any "disorder of thought or mood."

For these reasons, the majority errs by relying on past and possible future drug abuse to support its finding that Nagel did not carry his burden of proving that he is not "insane."

3. Turning to the issue of the evidence presented of Nagel's present mental condition, I find the record replete with uncontradicted evidence that Nagel does not presently suffer from a "disorder of thought or mood." OCGA § 37-3-1 (11). Dr. Everett Kuglar, the Medical Director of the Forensic Services Division of Central State Hospital, testified on Nagel's behalf. He testified that he had known Nagel since 1985 and that "since Mr. Nagel has been known to me, the only diagnosis that I have ever felt was appropriate is some amount of a personality disorder, which is not considered to be a major psychiatric mental disorder or disease." Dr. Kuglar stated that, from 1985 to the present, he has never seen any evidence that Nagel met the definition of mental illness set forth in OCGA § 37-3-1 (11). He also added that when he supervised Nagel's treatment from 1985 to 1988 at Georgia Regional Hospital in Augusta, Georgia, that Nagel had complete freedom to leave the hospital between 9:00 and 10:00 a.m. and return between 4:00 and 5:00 p.m. He added that Nagel had "walk-out work privileges" and was "free to come in and out of" the hospital for his part-time job and for activities and recreation on the local college campus. Dr. Kuglar testified that, while at Central State Hospital (Nagel transferred to Central State Hospital in 1989 and is there now; Dr. Kuglar transferred there shortly after Nagel), Nagel has been involved in work therapy programs and has never required a consistent medication regimen but only at times needed low-dose antianxiety medication. Kuglar added that, while at Central State, Nagel has not been a remarkable patient but has been a good patient. He reiterated that Nagel was not presently mentally ill, has no severe thought disorder, has good self-help and communication skills, and is a good worker.

Dr. Peter Storms, the senior psychologist for the Forensics Services Division at Central State Hospital, testified that he had known Nagel since March 1989, had seen him every day or every other day since then, and had consulted with the people on Nagel's treatment team on a regular basis. Dr. Storms testified that Nagel is of average intelligence and that since 1989 Nagel has never shown any evidence of a disorder of thought or mood that would render him mentally ill under the definition set forth in § 37-3-1 (11). He added that Nagel does not belong in a psychiatric hospital and that Nagel has "a lot of potential to eventually become a productive member of society." Dr. Storms again reiterated that Nagel "*absolutely* does not fit commitment criteria to our hospital or any hospital that I know of in the state." Dr. Storms stated that, although Nagel had severe problems as a youth, he has matured and the best indicator of his current condition was his behavior in the hospital since 1981. Dr. Storms made clear that evaluation of Nagel's current condition led to the conclusion Nagel is not mentally ill.

The trial court characterized the foregoing testimony on mental illness as "weighty" and noted that it went "uncontradicted by any of the state's witnesses"; yet, the court nevertheless held that Nagel had not carried his burden to show that he is not "insane."

I would characterize the experts' testimony as overwhelming evidence that Nagel is not presently mentally ill. Because Nagel offered such overwhelming evidence, and because the state relied solely on the presumption of insanity to carry its burden, the presumption of insanity must yield, and the trial court's determination that Nagel is presently "insane" must be reversed. See *Wilson v. State*, 257 Ga. 444, 449 (e) (359 SE2d 891) (1987).

4. In addition to concluding that Nagel proved by a preponderance of the evidence that he is not mentally ill, I also believe that he has proved by a preponderance of the evidence that he does not "present[ ] a substantial risk of imminent harm to [himself] or others, *as manifested by either recent overt acts or recent expressed threats of violence.*" (Emphasis supplied.) OCGA § 37-3-1 (9.1) (A) (i). As I have noted previously in this dissent, the majority has erroneously refused to address this independent ground for release.

At the release hearing, Nagel's experts testified that they did not believe that Nagel met this commitment standard, and the state offered no witnesses whatsoever to contradict that testimony. I concede that an inference of dangerousness can be drawn from an insanity acquittee's commission of a dangerous criminal act. However, here, even absent our statute, the passage of more than 13 years since the commission of the crime has certainly diminished any legal inference of dangerousness that may be drawn from it. Moreover, our statute expressly renders the inference virtually irrelevant in this case because

of the 13-year time span, as the law explicitly requires dangerousness to be evidenced by recent overt acts or recent expressed threats of violence, § 37-3-1 (9.1) (A) (i).

Further, although the experts could not guarantee Nagel would never be violent again, the possibility that he might be violent sometime in the future because of the possibility he might take drugs or alcohol is too remote to justify Nagel's commitment under a statute that requires the danger to be evidenced by "recent overt acts or recent expressed threats of violence." OCGA § 37-3-1 (9.1) (A) (i). In addition, the potential danger stems solely from potential drug or alcohol abuse and not from any alleged mental illness. As the only reasonable construction of the statute is that the danger must stem from the mental illness, see Stromberg & Stone, 20 Harvard Journal on Legislation at 330, 335, the potential danger from potential drug or alcohol abuse does not meet the commitment criteria.

5. Finally, although not addressed by the trial court, Nagel is entitled to release if he proved by a preponderance of the evidence that no further treatment purpose would be served by his continued confinement. OCGA § 37-3-1 (9.1) (B). Here, the essence of the two experts' testimony was that Nagel was not "in need of involuntary inpatient treatment." OCGA § 37-3-1 (9.1) (B). That evidence was not rebutted by the State, and warrants Nagel's release.

6. The mental health laws of this State are designed to provide healing and hope to people in need of involuntary inpatient treatment. Healing and hope denote change, the end of something old and the beginning of something new.

David Nagel has successfully proven that he has embarked on a new beginning. He has shown that he meets the criteria for release established by law. The only possible reasons for the majority's continuation of Nagel's confinement are the brutal nature of his crimes and the lack of a guarantee that he will never be dangerous again. These reasons, however, are not even used to continue the confinement of persons found to be responsible for their criminal acts and will turn our mental health hospitals, primarily designed for treatment, into warehouses for persons at one time found to be mentally ill and in need of inpatient treatment. Although there is no way to foretell Nagel's future conduct given the vagaries of human nature and the current state of both psychology and the law, we must not justify further periods of confinement for allegedly dangerous persons on the basis of guesswork predictions of future violence. Such preventive detention violates the letter and spirit of our mental health laws and should not be countenanced by this Court. The laws of this state are clear: immediate release is to be provided to all found not guilty by reason of insanity who are able to dig up the psychological minefields of their past and sow new lives, whatever their past transgressions

may have been.

As this Court must exercise its supervisory power and listen when no one else will, I must conclude that Nagel carried his burden to prove he should be released. There can be no pacification, no placation, no vacillation, no tergiversation on this very important issue of human rights.

The trial court's decision must be reversed.

DECIDED MAY 2, 1994.

*Torin D. Togut, Lisa J. Krisher, Phyllis J. Holmen,* for appellant.

*Peter J. Skandalakis, District Attorney, Jeffery Hunt, Assistant District Attorney, Michael J. Bowers, Attorney General,* for appellee.